AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

District of Delaware

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

One LG Cell Phone and One Apple iPhone
Seized on April 8, 2019

Case No. 19- 133M

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, incorporated herein

located in the _____ District of _____ Delaware _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, incorporated herein

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841(a), (b)(1)(C) | Delivery or Possession with Intent to Deliver a Controlled Substance |
| 21 U.S.C. 846 | Conspiracy |

The application is based on these facts:

See Attached Affidavit, incorporated herein

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Antonio Tiberi, TFO, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date:    04/26/2019

_____
*Judge's signature*

City and state:  Wilmington, Delaware

Hon. Mary Pat Thynge, Chief U.S. Magistrate Judge
*Printed name and title*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

IN THE MATTER OF THE SEARCH OF:

One LG Cell Phone and One Apple iPhone
Seized on April 8, 2019

CURRENTLY LOCATED AT:

DEA Wilmington Resident Office
New Castle, Delaware 19720

Case No. _____

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT TWO CELLULAR PHONES

I, Antonio Tiberi, being first duly sworn, hereby depose and state as follows:

### BACKGROUND OF YOUR AFFIANT

1.      I am an "investigative or law enforcement officer of the United States" within the

meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States

empowered by law to conduct investigations of and to make arrests for offenses enumerated in

Section 2516 of Title 18, United States Code.

2.      I have been employed as a Task Force Officer ("TFO") with the Drug Enforcement

Administration ("DEA") since September of 2017.   During that time, I have participated in

investigations into the distribution of controlled substances.   In addition to being assigned as a

TFO with the DEA, I have been employed for approximately eight (8) years as a Police Officer

with the Wilmington Police Department ("WPD").   I have spent the last four (4) years in WPD's

Drug Unit investigating drug dealers.

3.      I have received training in connection with the identification, manufacture, and

distribution techniques of illegal drugs, including cocaine, heroin, marijuana, and crystal

methamphetamine.   I have attended several schools and seminars that specialized in all aspects of

narcotics investigations, including the following: 1) Cultivation and Management of Confidential Informants; 2) General Narcotics Investigation; and 3) Drug Interdiction. I have received various awards and letters of commendation including, but not limited to, the following: The Wilmington Department of Police Outstanding Service Award (2012); Officer of the Year (2013); Distinguished Service Award (2013); Officer of the Year (2015); and Distinguished Unit Citation (2017).

4.      I have actively participated in investigations of criminal activity including drug trafficking. During these investigations, I have participated in the execution of search warrants and the seizure of evidence relating to drug trafficking activities. As a TFO with the DEA, I have testified under oath, affirmed applications of search and arrest warrants, and have participated in investigations which have resulted in the arrest and convictions of numerous individuals responsible for trafficking narcotics and committing violent crimes.

5.      I have participated in the recovery of kilogram quantities of cocaine, crack cocaine, and crystal methamphetamine. I have participated in the recovery of paraphernalia and financial proceeds related to drug activity. I have also participated in over 250 surveillance operations of individuals committing violations of the federal narcotics laws. Through my training and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, and with the method of payment for such drugs.

6.      I have debriefed over 100 defendants, informants, participants and various persons with direct experience with the methods used to distribute controlled substances.

7.      Based on my experience as a TFO with the DEA and a Drug Investigator with WPD, I am familiar with the means and methods that narcotic traffickers use to transport and distribute illicit drugs. I am acquainted with the support and assistance that drug trafficking

organizations require to conduct their illegal activities. I have become knowledgeable about the criminal statutes of the United States and the State of Delaware, particularly laws relating to violations of the federal narcotics, firearms, and conspiracy statues.

8.      As a result of my training and experience, I have learned about the importation, manufacture, concealment, and distribution of controlled substances, including, cocaine, crack cocaine, marijuana, heroin, and other controlled substances. I have also participated in over 20 investigations of violations of Title 21 of the United States Code, which have resulted in the arrests and convictions of persons for violations of these laws. I have participated in over 100 investigations of violations of Title 16 of the Delaware code, which have resulted in the arrests and convictions of persons for violations of these laws. I have been the affiant of over 50 search and seizure warrants, which led to the seizure of narcotics, items associated with drug trafficking, and documents relating to narcotics distribution.

9.      This investigation is being conducted by members of the DEA WRO. I am a case agent responsible for the investigation in aid of which this application is being made. This Affidavit is based upon my personal knowledge and observations, as well as information provided to me by other law enforcement officers, as well as individuals who have cooperated with law enforcement as described in detail below. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## DEFINITION OF THE SPECIFIED FEDERAL OFFENSES & TARGET DEVICES

10.      Probable cause exists that the requested searches will yield evidence of Possession with Intent to Distribute a Controlled Substance, in violation of Title 21, United States Code,

Sections 841(a)(1) and (b)(1)(c), and Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances, in violation of Title 21, United States Code, Section 846, specifically cocaine, cocaine base, and/or heroin (the "SPECIFIED FEDERAL OFFENSES").

11. The devices to be searched (collectively, the "TARGET DEVICES") are:

- A black and silver in color LG cellular phone; (302) 494-1778; IMEI: 089702119300300917; Subscribed to "Twan Johnson"; address of 1710 West 4th St, Wilmington, DE, hereinafter referred to as "TARGET DEVICE 1." TARGET DEVICE 1 was seized by law enforcement on or about April 8, 2019 and is currently stored at the DEA Office in New Castle, Delaware; and

- A white and pink in color Apple iPhone X; Unknown number; Unknown Address, hereinafter referred to as "TARGET DEVICE 2." TARGET DEVICE 2 was seized by law enforcement on or about April 8, 2019 and is currently stored at the DEA Office in New Castle, Delaware. Your affiant cannot safely determine the IMEI number for this phone without damaging it.

12. On April 8, 2019, law enforcement officers seized the TARGET DEVICES during the arrest of Antwyne SHAMBURGER at 10 Wardor Avenue, New Castle, DE. Based upon the below, there is probable cause to believe that the TARGET DEVICES were being used to facilitate SPECIFIED FEDERAL OFFENCES and that evidence of drug trafficking may be located on the TARGET DEVICES.

## TECHNICAL TERMS

13. Based on my training and experience, your affiant uses the following technical terms to convey the following meanings:

     a.     Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

     b.     Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

     c.     Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash

memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.      GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.      PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-

processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

      f.      Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

      g.      IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static – that is, long-term – IP addresses, while other computers have dynamic – that is, frequently changed – IP addresses.

      h.      Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

      14.      Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at https://www.apple.com/iphone-6s/specs/, your affiant knows that the TARGET DEVICES have

capabilities that allow them each to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. Your affiant also knows that iPhones and Android devices function is much the same was a tablets and have many if not all of the same capabilities. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

15.     Based on my knowledge, training, and experience, your affiant knows that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

16.     *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the device because:

a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.     Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.     The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.     Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

17.     *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant your affiant is applying would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

18.     *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, your affiant submits there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## FACTS ESTABLISHING PROBABLE CAUSE

A.    **Background of the Investigation**

19.    Between August 2018 and March 2019, the DEA initiated an investigation into Alfred EVANS ("EVANS"). SHAMBURGER is a subdistributor of EVANS. During this time period, a confidential source was used to make at least six (6) controlled purchases of crack cocaine or powder cocaine directly from EVANS.

20.    On February 19, 2019, the Honorable Colm F. Connolly, United States District Court Judge for the District of Delaware, issued an Order authorizing the interception of wire and electronic communications over the cellular phone bearing the number (302) 333-6368, serviced by AT&T and used by EVANS. Interception of communications began on February 25, 2019.

21.    During the TIII investigation, law enforcement intercepted four hundred and seventy (470) separate telephone calls, labelled as pertinent, containing conversations relating to the manufacture and distribution of cocaine base, cocaine HCL and heroin. During the wiretap investigation, EVANS would talk with SHAMBURGER frequently. Below is an example of one drug related intercepted conversation on March 8, 2019, at 1944 hours under Session 600, EVANS contacted SHAMBURGER on TARGET DEVICE 1. The pertinent portion of this conversation was as follows:

| | |
|---|---|
| SHAMBURGER: | Yo bro. |
| EVANS: | What you doing man? |
| SHAMBURGER: | Shit over river. |
| EVANS: | You telling him you talk to Ros [PH]. |
| SHAMBURGER: | Aha, yeah I talked to him earlier... did you talk her [PH] ? |
| EVANS: | No, no, I say he probably sleep. |
| SHAMBURGER: | You say, you was sleep? |
| EVANS: | I say, you probably sleep. |
| SHAMBURGER: | He, he back. |
| EVANS: | From where? |
| SHAMBURGER: | He went out and got the, got the shit. |
| EVANS: | Oh yeah? |
| SHAMBURGER: | Yeah. |

EVANS:          Oh, oh, oh, oh, I didn't know, I'm ready to call and see what's going on.

1.      During this conversation SHAMBURGER informed EVANS that "Ros" had returned from an unknown location.  Your affiant knows that EVANS' brother Ryan Evans, is referred to by a multitude of nicknames, one (1) being "Ros."[1]  SHAMBURGER stated that ROSCOE "went out and got the, got the shit."  Your affiant submits that SHAMBURGER was talking about picking up a quantity of controlled substances.

22.     On March 25, 2019, EVANS was arrested at his girlfriend's residence.  Inside the residence, police found approximately 500g of cocaine and 200g of crack cocaine.

**B.      Controlled Purchase from SHAMBURGER using TARGET DEVICE 1**

23.     During a previous meeting between a confidential source ("CS") and SHAMBURGER outside the presence of law enforcement, SHAMBURGER provided the CS with the TARGET DEVICE telephone number.

24.     On or about March 7, 2019, DEA case agents met with the CS to conduct a controlled purchase of crack cocaine from SHAMBURGER.

25.     Case agents conducted a search of the CS and the CS' vehicle for any illegal drugs, money, and other contraband.  The search was met with negative results.

26.     Between 12:51 p.m. and 3:06 p.m., the CS and SHAMBURGER exchanged several telephonic communications utilizing the TARGET DEVICE to discuss the purchase and delivery of a quarter-ounce of crack cocaine.[2]

---

[1] This was further corroborated following the execution of a search warrant on EVANS' main cellular telephone.  ROSCOE was saved in EVANS' contacts as "Ros," and photographs were stored depicting the brothers under the same telephone number.

[2] These conversations were recorded.

27.     At approximately 3:14 p.m., case agents transferred a predetermined amount of recorded departmental buy money for the purchase of the crack cocaine. Case agents also equipped the CS with a hidden electronic monitoring device to record the purchase of the crack cocaine from SHAMBURGER.

28.     At approximately 3:28 p.m., SHAMBURGER contacted the CS and directed the CS to go to the area of Jade's Palace, in the area of Lancaster Avenue and Franklin Street, in Wilmington, Delaware.

29.     Shortly thereafter, a member of your affiant's surveillance observed the CS arrive in the parking lot of Lancaster Liquors at 1234 Lancaster Avenue in Wilmington, Delaware. Agents and officers observed SHAMBURGER[3] enter the front passenger side of the CS' vehicle. While inside the vehicle, SHAMBURGER provided the CS with approximately one quarter-ounce of crack cocaine in exchange for the recorded departmental buy money. Immediately thereafter, agents and officers observed SHAMBURGER exit CS' vehicle and depart the parking lot on foot.

30.     At approximately 3:35 p.m., the CS departed the Lancaster Liquors parking lot. The CS remained under constant surveillance and was escorted by law enforcement to a predetermined post buy meet location.

31.     The CS arrived at the post-buy location and was met by agents and officers. The CS relinquished custody of approximately 35.9 gross grams of crack cocaine to the DEA case agents.

---

[3] Your affiant and other members of this investigation are familiar with what SHAMBURGER looks like from a prior arrest photograph.

32.     Case agents again searched the CS and the CS' vehicle for any illegal drugs, money, and other contraband. The results of the search were negative for any illegal drugs, money, and other contraband.

33.     Case agents conducted a field test of the suspected controlled substance, sold to the CS by SHAMBURGER, which tested positive for crack cocaine.

34.     Agents conducted a debriefing of the CS. During the debriefing, the CS told the agents that he/she met with SHAMBURGER in the area of the liquor store at the intersection of Lancaster Avenue and Franklin Street, Wilmington, Delaware. The CS advised agents that during the meeting, he/she purchased the crack cocaine from SHAMBURGER in exchange for the recorded buy money. Agents reviewed the recording from the hidden electronic monitoring equipment, confirming that the CS purchased an amount of crack cocaine from SHAMBURGER. Specifically, the audio and video recording of the meeting between CS and SHAMBURGER is consistent with the CS' recitation of events. Agents further confirmed that the telephone number the CS contacted SHAMBURGER on was in fact the TARGET DEVICE.

## C.     Arrest of Antwyne SHAMBURGER and the seizure of the TARGET DEVICES

35.     On March 24, 2019, the Honorable Christopher J. Burke, United States Magistrate Judge, signed a criminal complaint for SHAMBURGER for the distribution of a controlled substance; cocaine base.

36.     On March 29, 2019, the Honorable Christopher J. Burke, United States Magistrate Judge, issued a search warrant for the GPS Monitoring of cellular telephone TARGET DEVICE 1, utilized by SHAMBURGER.

37.     On April 4, 2019, the Honorable Mary Pat Thynge, United States Magistrate Judge, issued a search warrant for 10 Wardor Avenue New Castle, DE.

38.     On April 8, 2019, members of the DEA & ATF received a GPS location for SHAMBURGER'S cellular device, TARGET DEVICE 1, in the area of 10 Wardor Avenue located in New Castle, Delaware.  During that time, members of the DEA approached 10 Wardor Avenue and arrested SHAMBURGER as he was exiting the residence.

39.     At the time of his arrest, SHAMBURGER was in possession of the TARGET DEVICES which were both located in his front right pant leg pocket.  The phone number for TARGET DEVICE 1 was confirmed by a member of law enforcement, who called the phone number for TARGET DEVICE 1 and watched TARGET DEVICE 1 ring.  Law enforcement was unable to identify the number associated with TARGET DEVICE 2.

## CONCLUSION

40.     In your affiant's training and experience, your affiant knows it is common for individuals who engage in drug trafficking to utilize multiple cellular telephone devices, as well as to segregate their contacts with sources of supply or customers by device in order to maintain secrecy and to limit potential law enforcement detection.  In addition, your affiant knows that drug traffickers will often change phones in an effort to evade law enforcement.  Still, when a drug trafficker changes phones, they will often keep their old phone at their residence.

41.     In your affiant's training and experience, you affiant knows that drug traffickers and their associates often communicate via encrypted applications, iMessages, and other forms of communication that are not typically intercepted by law enforcement through TIII wiretaps.  In addition, drug traffickers and their associates also sometimes have seemingly innocent information that often constitutes evidence, including but not limited to photographs, videos, saved contacts, applications, financial records, and other evidence that establishes the extent of drug trafficking activities.  Your affiant submits that the instant TARGET DEVICES are also likely to have such information.

42.     There is probable cause to believe that SHAMBURGER violated SPECIFIED

FEDERAL OFFENSES.   There is also probable cause to believe that SHAMBURGER has used

the TARGET DEVICES to further the SPECIFIED FEDERAL OFFENSES.   And, based upon the

aforementioned information, your Affiant submits that probable cause exists to believe that the

TARGET DEVICES contain information regarding violations of federal criminal laws that were

committed by SHAMBURGER and others involved in drug trafficking in the District of Delaware.


_____

Antonio Tiberi
Task Force Officer
Drug Enforcement Administration


Sworn and subscribed
to before me this **24** day of **April**_____, 2019.

_____
The Honorable Mary Pat Thynge
United States Magistrate Judge

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

IN THE MATTER OF THE SEARCH OF:

One LG Cell Phone and One Apple iPhone
Seized on April 8, 2019

CURRENTLY LOCATED AT:

DEA Wilmington Resident Office
New Castle, Delaware 19720

Case No. _____

## ATTACHMENT A

1.      TARGET DEVICE 1: A black and silver in color LG cellular phone; (302) 494-1778; IMEI: 089702119300300917; Subscribed to "Twan Johnson"; Address of 1710 West 4th St, Wilmington, DE, hereinafter referred to as "TARGET DEVICE 1." TARGET DEVICE 1 was seized by law enforcement on or about April 8, 2019 and is currently stored at the DEA Office in New Castle, Delaware; and

2.      TARGET DEVICE 2: A white and pink in color Apple iPhone; Unknown number; Unknown Address, hereinafter referred to as "TARGET DEVICE 2." TARGET DEVICE 2 was seized by law enforcement on or about April 8, 2019 and is currently stored at the DEA Office in New Castle, Delaware.

3.      This warrant authorizes the forensic examination of each TARGET DEVICE for the purpose of identifying the electronically stored information described in Attachment B.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

IN THE MATTER OF THE SEARCH OF:

One LG Cell Phone and One Apple iPhone
Seized on April 8, 2019

CURRENTLY LOCATED AT:

DEA Wilmington Resident Office
New Castle, Delaware 19720

Case No. _____

## ATTACHMENT B

1.     All records on the TARGET DEVICE 1 & TARGET DEVICE 2 (together, the "TARGET DEVICES") described in Attachment A that relate to violations of violated Title 21, U.S.C. §§ 841(a)(1), (b)(1)(C), and 846, which prohibits any person from attempting or conspiring to deliver and/or possess with intent to deliver cocaine, cocaine base, and/or heroin (hereinafter "SPECIFIED FEDERAL OFFENSE") from March 1, 2018, to present, including:

a.     Any electronic calendars, notes, task lists, or other information relating to any person's whereabouts or activities relevant to violations of the "SPECIFIED FEDERAL OFFENSES";

b.     Images, pictures, photographs, videos, or other visual depictions sent or received by the TARGET DEVICES regardless of the underlying program used to create, store, send, or receive such depictions relating to violations of the "SPECIFIED FEDERAL OFFENSES";

c.     GPS data showing the location and movement of the TARGET DEVICES from August 1, 2018, to present;

d.     Bank records, checks, credit card bills, account information, and other financial records related to violations of the "SPECIFIED FEDERAL OFFENSES"; and

e. The content of any and all text messages or instant messages sent or received by the TARGET DEVICES regardless of the underlying program used to send and receive those messages relating to violations of the "SPECIFIED FEDERAL OFFENSES."

2.      Evidence of user attribution showing who used or owned the TARGET DEVICES at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, photographs, videos, documents, and browsing history, regardless of when the content/file was created.

3.      As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.